**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TILE OUTLETS OF AMERICA, LLC, | CASE NO. 09-61261-pwb |
| Debtor. | |

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TOA HOLDINGS, INC., | CASE NO. 09-85614-pwb |
| Debtor. | |

# DISCLOSURE STATEMENT
# FOR DEBTORS' PLAN OF REORGANIZATION

**Gus H. Small, Esquire**
**Karen Fagin White, Esquire**
**Anna M. Humnicky, Esquire**
**Cohen Pollock Merlin & Small, P.C.**
**3350 Riverwood Parkway**
**Suite 1600**
**Atlanta, GA 30339**

**Counsel for Debtor**

Dated: October 16, 2009

# I.  INTRODUCTION

This Disclosure Statement (this "Disclosure Statement") has been prepared pursuant to Section 1125 of the United States Bankruptcy Code on behalf of **Tile Outlets of America, LLC, and TOA Holdings, Inc.** (hereinafter referred to collectively as "Debtors") in connection with Debtors' solicitation of votes for their Plan of Reorganization dated October 16, 2009 (the "Plan").  It contains important information about Debtors and the Plan.

In providing this Disclosure Statement to parties in interest, Debtors expressly seek to enable such parties to make an informed judgment on whether to approve or reject the Plan.

This Disclosure Statement contains a summary of the Plan, general information about Debtors and their Chapter 11 cases and important information concerning Debtors' current and future financial condition.

The information contained herein has been prepared by Debtors in good faith, based upon information available to Debtors.  Debtors have never caused any of the financial information contained herein to be verified by an audit.  However, all financial information was compiled from the records of Debtors.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself, which is included as an exhibit hereto.  **Each creditor is encouraged to read, consider and carefully analyze the terms and provisions of the Plan**.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

This Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving Debtors or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or interests.

**THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER GOVERNMENTAL AGENCY, NOR HAS THE COMMISSION OR ANY SUCH OTHER GOVERNMENTAL AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, WHICH IS ANNEXED HERETO, SHOULD BE READ IN ITS ENTIRETY. ADDITIONALLY, IT MAY BE ADVISABLE FOR CREDITORS TO CONSULT THEIR OWN**

**COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.**

**NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FUTURE BUSINESS OPERATIONS, FINANCIAL CONDITION OR THE VALUE OF THEIR PROPERTY ARE AUTHORIZED BY DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.    ANY REPRESENTATIONS OR INDUCEMENTS MADE TO CREDITORS TO SECURE AN ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION.**

## II.   BRIEF DISCUSSION OF CHAPTER 11 OF THE BANKRUPTCY CODE

Under Chapter 11 of the Bankruptcy Code a Debtor is afforded an opportunity to rehabilitate its business and to restructure its financial obligations to its creditors. In some instances, a Debtor may also change the structure of its equity securities ("interests") by canceling one or more classes of equity securities or issuing new securities.

In general, a Debtor files a "Plan of Reorganization" which sets forth a proposal for settlement of the Debtor's debts.  A Debtor's debts are classified as either being unsecured or secured, depending on whether the Debtor has pledged any of its property to the creditor as collateral for the debt.

The Bankruptcy Code (the "Code") requires that certain unsecured debts receive priority in payment over other debts.  Examples of unsecured debts entitled to priority are expenses and fees incurred during the Chapter 11, wages and certain employee benefits, certain consumer obligations, and taxes.

The Code requires that a Plan propose full cash payment to all priority unsecured creditors except taxing authorities.  Taxes under the Code may be paid over time in installments.  Unsecured creditors may receive all or a portion of their claims under a Plan.

A Debtor under Chapter 11 may restructure its secured debt by paying its secured creditors in cash in full or in installment payments.  A Debtor may also arrange for a secured creditor's collateral to be sold or surrendered.

In any event, unless the creditors agree differently, a Plan must provide creditors with at least the same consideration which creditors would receive in a liquidation of Debtor under Chapter 7 of the Code.

The Debtor or other proponent of a Plan files the Plan with the Clerk of the Bankruptcy Court.  The Code requires that a Plan be accompanied by a Disclosure Statement.  The Disclosure Statement must contain a summary of the Plan and sufficient information about the Debtor and its financial affairs to enable a creditor or other party in interest to intelligently determine whether to vote for or against the Plan.

After the Plan and Disclosure Statement are filed, the Court holds a hearing on the adequacy of the Disclosure Statement. If the Court determines that the Disclosure Statement makes proper disclosure, then it is approved and the Plan and Disclosure Statement, along with a ballot are mailed to creditors and equity security holders for vote.

Typically, a date is set by the Court as the last day votes may be counted. The Court also schedules a Confirmation Hearing at which time the votes are counted and the Court hears evidence as to whether the Plan complies with various standards for confirmation under the Code. In order for the Plan to be approved by creditors and interest holders, a vote of two-thirds in amount and a majority in number of creditors of each class of "impaired" creditors who vote must affirmatively vote for the Plan.

If a class of impaired creditors does not accept the Plan, then the Plan may still be confirmed if it is "fair and equitable" respecting such class. The Code defines "fair and equitable" regarding unsecured creditors as generally meaning payment of the entire amount of each creditor's claim or that no class of creditors or interest holders with a lesser priority will receive any consideration under the Plan. Regarding secured creditors, "fair and equitable" generally means that the creditor receives the "indubitable equivalent" of its secured claim or cash or deferred payments with a present value equal to the amount of the secured claim.

When a Plan is confirmed notwithstanding the lack of acceptance of all impaired classes, it is said that the Debtor has effected a "cramdown" of the Plan. "Impaired" means that the creditor or interest holder is not receiving precisely the same rights it was entitled to under its contract with the Debtor. Generally, unless an unsecured creditor receives one hundred percent of its claim in cash, it is said to be impaired.

When a Debtor's Plan is confirmed, the Debtor receives a discharge or release of all indebtedness which it does not pay under the provisions of the Plan. The discharge applies whether or not a creditor received notice of the Chapter 11 proceeding.

## III.  GENERAL INFORMATION AND BACKGROUND CONCERNING DEBTORS

### A.  Pre-bankruptcy History of Debtors

### 1.    General Background

Tile Outlets of America, LLC ("Tile Outlets") is a Delaware limited liability company organized in August 2002 with headquarters in Norcross, Georgia. It has 5 employees in the Norcross office, including management; these employees are responsible for accounting and finance, purchasing, information systems, advertising and marketing, general store support, and human resources. Tile Outlets has a wholly-owned subsidiary, Tile Outlets of America, Florida LLC, ("TOAF") which has

retail stores in Fort Myers and Tampa, Florida. Tile Outlets is a wholly-owned subsidiary of TOA Holdings, Inc. ("Holdings") which is majority owned and controlled by Curt Rapp and Don Aronin, Tile Outlets' CEO and President, respectively. Combined, Tile Outlets and TOAF have approximately 47 full and part-time employees.

Tile Outlets operates retail tile and stone warehouse stores in Fort Myers and Tampa, Florida. The Fort Myers store opened in September 2002 and operates out of a 43,500 square foot leased location. The Tampa store opened in May 2003 and operates out of a 40,000 square foot leased location. Each store maintains a significant in-stock selection of first quality porcelain and ceramic tile, granite, marble, travertine, and slate along with a full complement of medallions, mosaics, and decorative borders. Each store also carries all materials and tools needed to complete a tile installation. Tile Outlets caters to retail consumers as well as building contractors and professional tile installers. Its retail stores are open 7 days a week, 52 weeks a year with the exception of Easter, Thanksgiving, Christmas Eve Day and Christmas Day.

## 2.    Events Leading to Chapter 11 Filing

### i.    General Economic Conditions

Tile Outlets enjoyed consistent annual sales growth at both its Fort Myers and Tampa store locations through 2006. For the 2006 calendar year the Fort Myers store generated sales of $8.1 million and the Tampa store generated sales of $6.7 million. Both stores posted their first year over year sales declines in 2007, when the Fort Myers store generated sales of $7.6 million and the Tampa store generated sales of $5.3 million. During July 2006, Tile Outlets opened a new store location in Pinellas Park, Florida. Unlike the Fort Myers and Tampa store locations, there was no material increase over time in monthly sales at the Pinellas Park store and Tile Outlets suffered direct losses of approximately $1.0 million as a result of operating this store during the 18 months it was open. Furthermore, the Pinellas Park store resulted in some cannibalization of sales from the Tampa store. After many months of negotiation, Tile Outlets was able to terminate the lease for the Pinellas Park store on favorable financial terms and closed this store location in December 2007.

Subsequent to closing the Pinellas Park store location in December 2007, the U.S. economy in general, and the local economies in the Fort Myers and Tampa, Florida markets specifically, weakened substantially throughout 2008. With an average foreclosure rate of 5.5 times the national average, the Cape Coral/Fort Myers area has consistently experienced one of the three highest foreclosure rates in the United States over the past two (2) years. Furthermore, the median home price in Lee County (where Cape Coral and Fort Myers are located) has fallen over the past 2 years from almost $300,000 to less than $90,000, a price last seen in 1999. Combined with a higher than average unemployment rate which reached 13.5% in August 2009, the demand for Debtor's products has dramatically declined during this time period. The situation is similar in the Tampa area where home prices have fallen almost 40% from the July 2006 peak and more than 30% of all

homeowners with a mortgage have negative equity in their homes. The unemployment rate in the Tampa area currently exceeds 11%.

This weakening of the economy accelerated throughout the fourth quarter of 2008 resulting in a substantial sales reduction in 2008 at the Fort Myers store and a more modest reduction at the Tampa store. In Fort Myers, 2008 sales declined by 27.6% to $5.5 million and Tampa's sales declined by 5.6% to $5.3 million. Sales in Tampa were bolstered in 2008 by virtue of the fact that it no longer suffered cannibalization of sales that occurred when the Pinellas Park store was open.

### ii.    Litigation

The sales decline suffered in 2008 severely limited Tile Outlets' ability to pay its suppliers in a timely manner. This caused many suppliers to require cash in advance in order to ship product to Debtor. In December 2008, two suppliers refused to ship product despite receiving cash in advance and chose to apply the payments against outstanding invoices. One of these suppliers, Travertine Brothers, also filed a lawsuit against Tile Outlets in late December 2008 for the balance owing.

## B.  Summary of Activities in Debtors' Chapter 11 Cases

## 1.    Tile Outlets of America, LLC

Tile Outlets' Chapter 11 case was instituted on January 16, 2009.  The case is pending before the Honorable Paul W. Bonapfel, U.S. Bankruptcy Judge for the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division.  Tile Outlets has continued in possession of its assets, and no Trustee has been appointed.

In conjunction with its Chapter 11 petition filing, Tile Outlets filed several motions seeking what is commonly referred to as "first day" relief. This first day relief was designed to meet the goals of (1) continuing Tile Outlets' business operations in Chapter 11 with as little disruption as possible, (2) maintaining the confidence and support of customers, employees, suppliers and other key constituencies, and (3) establishing procedures for the smooth and efficient administration of the Chapter 11 case.

The Court approved the requested first day relief in various orders ("First day Orders") entered by the Court on January 21, 2009, and such First Day Orders provided for, among other things:

a.    The continued maintenance of Tile Outlets' existing bank accounts and cash management system, and use of its existing checks and deposit slips, in the ordinary course of business;

b.    Authority to pay employees accrued pre-petition wages, salaries and benefits;

c.    Authority to pay certain customer-related obligations and critical vendor obligations;

d.    Authority to pay the purchase price, customs duties, freight charges, and other costs of any goods accepted by Tile Outlets on or after the date of the filing of the petition initiating the Chapter 11 case; and

e.    Tile Outlets' use in the ordinary course of its business of the cash collateral otherwise pledged to secure its indebtedness to Branch Banking and Trust Company, in accordance with a budget.

Tile Outlets also sought and subsequently obtained the following relief:

a.    Authority to retain Cohen Pollock Merlin & Small, P.C. as its legal counsel and Habif, Arogeti & Wynne, LLP as its accountants in the Chapter 11 proceedings;

b.    Authority to pay certain pre-petition store level and store management bonuses;

c.    An Order prohibiting utility providers from altering or discontinuing services and establishing procedures to determine requests for additional assurances of payment of utility bills;

d.    An Order approving the rejection of certain leases with Toyota Financial Services;

e.    Orders approving continued use of cash collateral;

f.    Continued cost-cutting initiatives;

g.    Re-negotiation of Tile Outlets' premises leases;

h.    Orders approving the extension of time in which Tile Outlets may assume or reject leases of non-residential real property;

I.    An Order granting Tile Outlets authority to enter into an insurance premium finance agreement;

j.    Authority to retain Arnall Golden Gregory, LLP, as  special counsel to assist with obtaining exit financing;

k.    Extensions of the exclusive period during which only Tile Outlets may file and solicit acceptances to a plan; and

l.    Filing of the Holdings case in order to provide for substantive consolidation of Debtors and their estates via a Plan of Reorganization.

### C.  Discussion of Debtor's Financial Rehabilitation in Chapter 11

Since September 2008, Tile Outlets has conducted a thorough review of its business model and expenses and has taken numerous actions to enable Tile Outlets to withstand the current economic recession and conduct its operations on a profitable basis. In total, Tile Outlets has eliminated approximately $1,000,000 of annual expenses. These expense reductions have been achieved through a combination of head count reduction, salary and wage reductions, improved operational efficiencies and procedures, and, significantly, renegotiated lease payments. Subsequent to its Chapter 11 filing, Tile Outlets has renegotiated the lease payment terms for both the Fort Myers and Tampa store locations resulting in combined annual cost savings of more than $300,000 at current revenue levels.

## IV.  SUMMARY OF THE PLAN

Debtors' Plan provides for the satisfaction of all allowed administrative claims on the Effective Date or as soon as practicable thereafter.  As to each administrative claim allowed thereafter, payment will be made as soon as practicable, subject to Debtors' ability to make distributions to the general unsecured class, after reserving an adequate amount to pay any priority and administrative claims that are subject to objection at the time of said distribution.  Debtors' Plan also provides for the satisfaction of all priority tax indebtedness either in cash or over a five year period in installments with interest as provided in 11 U.S.C. section 1129.  There are no known priority claims other than administrative expense claims.

Respecting other creditors, Debtors' Plan provides for one hundred percent payment of the Avaya Financial and Court Square Leasing allowed secured claims, payment in full of the allowed secured portion of the claims of GE Capital and Toyota Financial Services, as further detailed in sub-sections B and C below, with the balance their respective allowed claims paid on the same terms as the general unsecured creditors, and for a one-time payment equal to seven and one-half percent (7.5%) of the claims of each of Debtors' creditors with allowed unsecured claims.  With respect to Debtors' premises leases, the Plan provides for the continuation of contractual payments, plus six monthly payments of one-sixth (1/6) of the accrued and unpaid rental which existed when Tile Outlets filed its Chapter 11 Petition.

### A.   Secured Claim of Branch Banking & Trust Co.

Branch Banking & Trust Co. ("BB&T") holds a first priority security interest in virtually all of Debtors' assets including inventory, accounts receivable, furniture, fixtures and equipment.  As stated elsewhere in this Disclosure Statement, BB&T held an aggregate claim of **$910,000.00,** at the time of the filing of Tile Outlets' case.  Said claim has been reduced by principal and interest payments made by Tile Outlets since the filing of the case.  As of the date of the filing of this Disclosure Statement, BB&T's claim is approximately $801,000.00. BB&T will receive a payment equal to its claim as of the Effective Date, not to include any fees or amounts resulting from a default interest rate.

509017v.4

### B.   Secured Claim of GE Capital

The Plan provides for payment of secured portion of the Allowed Claim of GE Capital ("GE"), $21,147.98 (the "GE Secured Claim"), in monthly installments with interest accruing on the unpaid balance at the pre-Petition contract rate of nine and two tenths (9.2 %) percent per annum, payable over a period of twelve months. Debtors have stated in the Plan an amount which Debtors believe is the correct valuation of the GE Secured Claim. Any indebtedness owed by Debtors to GE over and above the valuation amount will be treated and paid as a general unsecured claim.

### C. Secured Claim of Toyota Financial Services

The Plan provides for payment of secured portion of the Allowed Claim of Toyota Financial Services ("Toyota"), $16,950.83 (the "Toyota Secured Claim"), in monthly installments with interest accruing on the unpaid balance at the pre-Petition contract rate of eight and three quarters (8.75 %) percent per annum, payable over a period of twelve months. Debtors have stated in the Plan an amount which Debtors believe is the correct valuation of the Toyota Secured Claim. Any indebtedness owed by Debtors to Toyota over and above the valuation amount will be treated and paid as a general unsecured claim.

### D. Other Secured Claims

The Plan provides for payment in full of the allowed secured claims, other than BB&T, GE, and Toyota pursuant to the terms of the existing contracts between the parties.

### E.   General Unsecured Creditors

General unsecured claimants will receive a payment equal to seven and one-half percent (7.5%) of such holder's claim in full and final satisfaction of such claim.

### F.   Landlords' Claims

With respect to Debtors' premises leases, the Plan provides for the continuation of contractual payments, plus six monthly payments of one-sixth (1/6) of the accrued and unpaid rental which existed when Tile Outlets filed its Chapter 11 Petition.

### G. Interests

As of the Effective Date, all Interests and Shares shall be deemed cancelled and rendered null and void. Holders of interests in Tile Outlets and shares in Holdings shall not receive or retain any property under the Plan on account of such interests or shares, and no distributions or dividends will be paid with respect to the allowed interests. Interests as defined in the Plan include the former equity interests of Paul Sanders and Charissa Rapp which were evidenced by Promissory Notes as

509017v.4

of Tile Outlets' Petition Date.

## H. Funding for the Plan

### 1.    New Equity Investment

On the Effective Date of the Plan, Donald Aronin, Tile Outlets' President and Holdings' Secretary, will pay to the Reorganized Debtor $385,000.00 to purchase a 77.78% equity interest in the Reorganized Debtor. On the Effective Date of the Plan, Warren Lampert, Tile Outlets' CFO, will pay to the Reorganized Debtor $55,000.00 to purchase a 11.1% equity interest in the Reorganized Debtor.  Lori E. Kirschner and Helaine O. Lasky will each pay the Reorganized Debtor $27,500.00 for their respective 5.56% equity interests in the Reorganized Debtor. From and after such date all current and outstanding equity interests in Debtors will be extinguished and cancelled.

### 2.    Senior Secured Debt Financing

On the Effective Date of the Plan, Mitchell Lewis ("Lewis") will provide exit financing to the Reorganized Debtor in the form of a 10 year term loan ("Term Loan") in the original principal amount of $250,000.00 which will be secured by a first lien on all of the Reorganized Debtor's assets including inventory, accounts receivable and personal property, subject only to existing and future purchase money security interests. The Term Loan will bear interest at 9% fixed per annum for the first 24 months after the Effective Date of the Plan, and thereafter the Term Loan will bear interest at LIBOR plus 9%.  The default rate shall be the stated rate plus 3%.  There shall be no pre-payment penalty, however, pre-payment must be made in increments of $10,000.00.  During the first 24 months after the Effective Date of the Plan, payments to Lewis will be made by the Reorganized Debtor in the amount of $3,166.89 per month.

Other covenants under the Term Loan include: 1) the Reorganized Debtor must maintain an inventory of not less than $1.2 million at all times during the Term Loan, until the balance due to Lewis is paid in full; 2) the Reorganized Debtor may borrow $300,000.00 from Irene Aronin (the "Subordinated Lender") pursuant to the terms listed below under the heading "3. Subordinated Secured Debt Financing"; and 3) Lewis has an option to purchase a 2% interest in the Reorganized Debtor for $1.00, and if any principal or interest to Lewis remains outstanding at the conclusion of  the 27th month after the Effective Date of the Plan, Lewis' ownership option shall increase by .1% for each partial or full month thereafter until said principal and interest is paid in full, but in no event shall the ownership interest subject to Lewis' option to purchase exceed 5% in the aggregate.  The Reorganized Debtor may use the proceeds of the Term Loan for general working capital for the Reorganized Debtor following the Effective Date of the Plan, including payments due under the Plan.

3.    **Subordinated Secured Debt Financing and Other Potential Financing**

On the Effective Date of the Plan, the Subordinated Lender will provide financing to the Recognized Debtor in the form of a 10 year term loan ("Subordinated Term Loan") in the original principal amount of $300,000.00 that will be secured by a second (and subordinated) lien on all of the Reorganized Debtor's assets including inventory, accounts receivable and personal property, subject only to already existing purchase money and blanket security interests. The Subordinated Loan will bear interest at 12% per annum. Equal monthly payments of principal and interest shall be made by the Reorganized Debtor in the amount of $4,304.13 per month. The Reorganized Debtor may use the proceeds of the Subordinated Term Loan for general working capital for the Reorganized Debtor following the Effective Date of the Plan, including payments due under the Plan. Additional subordinated financing may be obtained from Erica Aronin, wife of Don Aronin, if needed for the Reorganized Debtor's operations.

## I. Substantive Consolidation

The Plan provides for the substantive consolidation of Tile Outlets and Holdings, including all assets and debts of the Debtors and the Estates, into one entity as the Reorganized Debtor.

## J. Other Plan Provisions

Debtors will assume all executory contracts and unexpired leases not previously rejected. Cure of arrearages for premises leases will be provided as indicated in Part IV D above.

All Avoidance Actions (as defined in the Plan) will be extinguished on the Effective Date.

**THE ABOVE SUMMARY IS A BROAD OUTLINE OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED AS EXHIBIT "A" TO THIS DISCLOSURE STATEMENT.**

## V.  DISCUSSION OF BEST INTEREST OF CREDITORS: TREATMENT IN A CHAPTER 11 VS. CHAPTER 7

Another confirmation requirement is the "Best Interest Test," which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Then unsecured creditors are paid from any remaining sales proceeds according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. After considering the effect that a Chapter 7 liquidation would have on the value of the Debtors' estates, including the costs of and claims resulting from a Chapter 7 liquidation, the adverse effect of a forced sale on the prices of Debtors' assets, and the adverse impact resulting from the departure of the Debtors' employees, the Debtors have determined that confirmation of the Plan will provide each holder of a claim or interest with a recovery that is no less than each such holder would receive pursuant to liquidation of Debtors' assets under Chapter 7 liquidation.

Attached as Exhibit B is an unaudited liquidation analysis (the "Liquidation Analysis") demonstrating the basis for Debtors' belief as stated herein. Since the Liquidation Analysis has not been audited or reviewed by an independent public accountant, no opinion or any other form of assurance as to its accuracy is expressed. The Liquidation Analysis reflects the Debtors' estimate of the value that may be realized by Debtors' estates and the potential recoveries that may be available to holders of allowed claims and allowed equity interests if the Debtors' assets were liquidated and the proceeds distributed in accordance with Chapter 7 of the Bankruptcy Code. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are subject to inherent economic and competitive uncertainties and contingencies beyond the control of the Debtors, and are based upon assumptions with respect to liquidation decisions that are subject to change. Accordingly, there can be no assurance that the values and costs reflected in the Liquidation Analysis would be realized if the Debtors' assets were, in fact, to undergo such a liquidation.

For purposes of the Liquidation Analysis, it is assumed hypothetically that a plan of reorganization could not ultimately be confirmed at the confirmation hearing and, on or about that date, the Chapter 11 case is converted to a Chapter 7 case. In connection with the hypothetical commencement of the Chapter 7 case, it is assumed that the role of the Debtors terminates on or about the hypothetical conversion date and a Chapter 7 trustee is appointed to, among other things, manage the liquidation process and distribute the liquidation proceeds ultimately realized in accordance with the priorities established by the Bankruptcy Code. In such a case, the Chapter 7 trustee would have to consider, and ultimately pursue, one or more recovery strategies other than the Plan.

Costs that have been specifically identified in connection with the recovery

509017v.4                          Page 12 of  20

and/or liquidation of individual asset classes have been deducted in order to arrive at the amounts reflected in the Liquidation Analysis.  The classification and dollar amounts of estimated allowed claims incorporated within the Liquidation Analysis are subject to modification pending further analysis and the receipt of additional information with respect to such claims. Potential recoveries resulting from alleged preference claims are not addressed in the Liquidation Analysis.

## VI.  FINANCIAL INFORMATION

Debtor has included with this Disclosure Statement two exhibits which analyze its cash flow, net income and current assets.  Attached as Exhibit "B" is a Liquidation Analysis which shows that whether Debtors' assets are liquidated through a Going Out of Business (GOB) sale or immediate cessation of business, there would at best be less than a 1% recovery for general unsecured creditors.

Attached as Exhibit "C" is a twelve month "Projected Revenues and Expenses" which contains Debtors' best estimate of net income during the next twelve months.

## VII. ANALYSIS OF CLAIMS AND APPROXIMATE DISTRIBUTIONS TO CREDITORS UNDER THE PLAN

### A.  Projected Administrative Expenses

Debtors provide the following as an estimate of administrative expenses incurred and to be incurred in connection with confirmation of the Plan and closing of the Bankruptcy Estate:

| | |
|---|---|
| Bankruptcy Counsel fees and expenses | $  55,000.00[1] |
| Committee Counsel fees and expenses | 6,000.00 |
| Accountants' fees and expenses | 2,500.00 |
| Plan and Disclosure Statement printing | |

---

[1]  Counsel for Debtors estimates that its total fees and expenses for representing the Debtors and Debtors in Possession in this Chapter 11 case will approximate $145,000.00.  Of this amount, counsel has been paid approximately $90,000.00, and has unbilled time of approximately $20,000.00.  Debtors' counsel estimates an additional $35,000.00 to be charged in conjunction with confirmation of the Plan and closing of the bankruptcy estate.  Counsel has approximately $40,000 in escrow to cover future fees and expenses of all retained professionals (for Debtors and the Creditors' Committee), and pursuant to Court order, Tile Outlets has been paying counsel the sum of $4,000.00 per week which counsel has been escrowing to cover future fees and expenses.  The amount shown in Section D below is the amount of fees and expenses estimated to be in excess of the amount in escrow in January 2010.

| | |
|---|---|
| and mailing | 1,000.00 |
| U.S. Trustee fees through 1st quarter 2010 | 20,475.00 |
| Other miscellaneous administrative expenses | 500.00 |
| **Total administrative expenses incurred in connection with confirmation and closing** | **$ 85,475.00** |

## B.  Projected Priority Claims[2]

As of the date of this Disclosure Statement, priority tax and claims totaled **$4,907.48** as follows:

| NAME OF CLAIMANT | AMOUNT OF CLAIM |
|---|---|
| Hillsborough County Tax Commissioner (2009 estimated tax claim) | $2,918.87 |
| Lee County Tax Commissioner (2009 estimated tax claim) | $1,988.61 |
| Internal Revenue Service | $     0.00 |
| **TOTAL PRIORITY TAX CLAIMS** | **$4,907.48** |

These claims will be paid either in cash in full or over five years as provided in 11 U.S.C. 1129(a)(9)(C).

## C.  Analysis of Claims Payments

Debtors' preliminary analysis of unsecured claims indicates that pre-petition scheduled unsecured non-priority claims total approximately $2,550,000.00.  The 7.5% distribution to allowed unsecured claims is estimated to be $191,250.00.  The monthly payment to the non-BB&T secured creditors will be $3,861.00. The monthly "catch up" payment to Debtors' landlords will be $12,119.44 for six months. The one-time payment to BB&T is estimated to be $801,000.00**.**

---

[2]     Debtors know of no other allowable priority claims other than administrative claims as analyzed above and the tax claims set forth in this section.

## D.  Projected Plan Pay-outs

Projected approximate initial pay-outs under Debtors' Plan are as follows:

| Category or Class of Claim | Initial Payment |
|---|---|
| Administrative Expenses - one time payment | $         0.00[3] |
| Priority Tax Claims | $     4,907.48 |
| General Unsecured - one time payment | $  191,250.00 |
| Non-BB&T Secured Creditors - Payable monthly | $     3,861.00[4] |
| Premises Lease payments (including 1/6 catch up payment) | $   71,512.44 |
| BB&T - one time payment | $  801,000.00 |
| **Total Initial Pay-out** | **$1,072,530.92** |

---

[3]     This amount is the amount that would not be covered by the funds escrowed by Debtors.  See footnote 2, above.

[4]     Note that payments to non-BB&T secured creditors commence within thirty days of the Effective Date of the Plan.  These payments are monthly.

## VIII. LITIGATION; BANKRUPTCY CAUSES OF ACTION;
## AND RECOVERY OF ASSETS

Debtors know of no litigation which will be instituted against any party following confirmation of the Plan except for routine objections which may be instituted against claimants whose claims are disputed by Debtors.

Further, Debtors knows of no preference, fraudulent conveyance or other bankruptcy related cause of action for which the possibility of a material recovery for the benefit of the Bankruptcy Estate exists; therefore those claims will be extinguished upon Confirmation. Debtors believe that certain non-material preference claims exist against Travertine Brothers, Bestview, Paul Sanders and Charissa Rapp.

## IX. INFORMATION REGARDING SALARIES OF
## CURRENT AND FUTURE INTEREST HOLDERS

| | |
|---|---|
| Don Aronin: | $180,000.00 (annual for 2010) |
| Warren Lampert: | $142,875.00 (annual for 2010) |
| Curt Rapp: | $60,000 for 1/1/10 through 6/30/10; $18,000 for 7/1/10 - 12/31/10 |

## X. INFORMATION REGARDING SUBSTANTIVE CONSOLIDATION

By this Plan and Confirmation of same, Debtors seek substantive consolidation for business and tax purposes. Tile Outlets is a wholly owned subsidiary of Holdings; Holdings has no separate business, assets or creditors apart from Tile Outlets.

## XI. INFORMATION RELEVANT TO THE RISKS
## POSED TO CREDITORS UNDER THE PLAN

The only risk to any of Debtors' creditors under the Plan is that the New Equity Investments, the Term Loan, and the Subordinated Term Loan may not be sufficient to fund the initial pay-out, as well as, for the non-BB&T secured creditors, that the Reorganized Debtor's business operations do not generate sufficient positive cash flow to make the monthly payments to secured creditors. Creditors are advised to closely review the financial analyses included with this Disclosure Statement.

## XII. FEDERAL AND STATE TAX IMPLICATIONS TO CREDITORS

Debtors do not believe that there are any adverse federal and state tax implications to creditors by virtue of the treatment of their claims under the Plan, except to the extent that any creditor has written off all or a portion of its claim against Debtors as a bad debt.

In any event creditors are well advised to consult their tax advisors as to whether the Plan provides any individual adverse tax implications.

### XIII. CONCLUSION

Debtors submit that its Plan provides for an orderly and expeditious payment of their indebtedness to their creditors.  Debtors further submit that the alternative of a Chapter 7 liquidation does not appear to Debtors as a viable method of maximizing recovery to creditors in this case.

Respectfully submitted this 16th day of October, 2009.

**COHEN POLLOCK
MERLIN & SMALL, P.C.**
Counsel for Debtors

_____/s/ Don Aronin_____
Don Aronin
President and Chief Operating Officer,
Tile Outlets of America LLC

_____/s/ Karen Fagin White_____
Gus H. Small
GA Bar No.: 653200
Karen Fagin White
GA Bar No.: 754450
Anna M. Humnicky
GA Bar No.: 377850
3350 Riverwood Parkway
Suite 1600
Atlanta, GA 30339
(770) 858-1288
Fax: (770) 858-1277
gsmall@cpmas.com
kfwhite@cpmas.com
ahumnicky@cpmas

_____/s/ Don Aronin_____
Don Aronin
Secretary, TOA Holdings, Inc.

EXHIBIT "A"

PLAN OF REORGANIZATION

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TILE OUTLETS OF AMERICA, LLC, | CASE NO. 09-61261-pwb |
| Debtor. | |

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| TOA HOLDINGS, INC., | CASE NO. 09-85614-pwb |
| Debtor. | |

# PLAN OF REORGANIZATION
# PROPOSED BY
# TILE OUTLETS OF AMERICA, LLC
# AND TOA HOLDINGS, INC.

## OCTOBER 16, 2009

**Gus H. Small, Esquire
Karen Fagin White, Esquire
Anna M. Humnicky, Esquire
Cohen Pollock Merlin & Small, P.C.
3350 Riverwood Parkway
Suite 1600
Atlanta, GA 30339**

**Counsel for Debtors**

**NO MATERIALS OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS APPROVED BY THE BANKRUPTCY COURT HAVE BEEN AUTHORIZED FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.**

508900v4

## PLAN OF REORGANIZATION

## ARTICLE I.

## <u>INTRODUCTION</u>

Tile Outlets of America, LLC ("Tile Outlets"), and TOA Holdings, Inc. ("Holdings," collectively with Tile Outlets, the "Debtors"), the Debtors in the above-referenced Bankruptcy Cases, hereby propose and file the following Plan of Reorganization providing for the substantive consolidation of the two bankruptcy estates and for a reorganization of their debts.   This Plan of Reorganization (the "Plan") should be considered in conjunction with the Disclosure Statement, which the Debtors have filed contemporaneously herewith.

## ARTICLE II.

## <u>DEFINITIONS AND RULES OF INTERPRETATION</u>

**2.1    Scope of Definitions and Rules of Interpretation.**

**2.1.1**  For purposes of the Plan, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in Article II of the Plan. Any term used in the Plan that is not defined herein, but is otherwise defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

**2.1.2**  The rights and obligations arising under the Plan shall be interpreted, governed by, and construed and enforced in accordance with the laws of the State of Georgia (without regard to the conflict of law principles thereof), the Bankruptcy Code, and the Bankruptcy Rules, as appropriate.

**2.2    Definitions.**

**2.2.1** *Administrative Claim* shall mean an Allowed Claim for payment of an administrative expense of a kind specified in Section 503(b) of the Bankruptcy Code and entitled to priority payment pursuant to Section 507(a) of the Bankruptcy Code, including (a) the actual, necessary costs and expenses incurred after the Petition Date of preserving either of the Estates and operating the Debtors' business, including wages, salaries, or commissions for services rendered after the Petition Date, (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses approved, awarded or allowed under Sections 330(a) or 331 of the Bankruptcy Code, (c) the post-Effective Date costs and expenses of administering the substantively consolidated Estate, and (d) all Allowed Claims that are entitled to be treated as

Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

**2.2.2** *Allowed Claim* shall mean a Claim against Debtors to the extent that such Claim is unpaid and (a) has been allowed by a Final Order of the Court; or (b) is (I) listed in the Debtors' Schedules, other than a Claim that is Scheduled at zero or unknown amount or as disputed, contingent, or unliquidated, or (ii) evidenced by a proof of claim that has been filed with the Court on or before the Bar Date or deemed filed pursuant to any Final Order of the Court or under applicable law, and as to which (A) no objection to its allowance has been timely filed, or (B) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order; or (C) is allowed pursuant to the terms of this Plan. Notwithstanding any other provision of the Plan, the term "Allowed Claim" shall not include any Claim held by a creditor against which the Debtors have asserted a Cause of Action that has the effect of precluding a Distribution with respect to such Claim. An Allowed Claim shall not include any interest accrued after the Petition Date (on any Claim other than a Secured Claim) or any penalty. In the case of Allowed Claims that are Tax Claims, any interest in excess of 7.5% shall be considered a penalty and not allowed.

**2.2.3** *Assets* shall mean all property of the Debtors and the Estates as defined in Section 541 of the Bankruptcy Code, including without limitation all right, title, and interest in and to any Avoidance Actions or other Causes of Action that the Debtors or the Estates may have as of the Effective Date or any time thereafter.

**2.2.4** *Avoidance Actions* shall mean any actions, causes of action, claims, demands, suits, or rights, created or arising in favor of the Debtors or their Estates under the Bankruptcy Code, including all claims, rights and causes of action arising under Section 510 or under any of Sections 542 through 553 of the Bankruptcy Code, in each case regardless of whether such actions, causes of action, claims, demands, suits or rights are commenced prior to or after the Effective Date.

**2.2.5** *Ballot* shall mean each of the voting forms that will be distributed by Order of the Court to holders of Claims in Classes that are impaired and entitled to vote under the Plan.

**2.2.6** *Bankruptcy Cases or Cases* shall mean the Chapter 11 bankruptcy cases of the Debtors now pending before the Court.

**2.2.7** *Bankruptcy Code* or *Code* shall mean the Bankruptcy Reform Act of 1978, as amended and codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended and applicable to these Cases.

**2.2.8** *Bankruptcy Rules* shall mean: (a) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, (b) the Federal Rules of Civil Procedure, and (c) the Local Rules of the Court, all as amended from time to time and as applicable to this Case or proceedings therein.

**2.2.9** *Bar Date* shall mean the last date set by the Court to file proofs of claim asserting a pre-petition claim. The Bar Date was previously set by the Court in the Tile Outlets case as August 11, 2009.

**2.2.10** *Business Day* shall mean any day, excluding Saturdays, Sundays, and legal holidays, on which commercial banks are open for business in Atlanta, Georgia.

**2.2.11** *Cash* shall mean legal tender of the United States of America.

**2.2.12** *Causes of Action* shall mean any and all of the Debtors' and the Estates' claims, causes of action, suits, proceedings, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, torts, penalties, statutory violations, agreements, promises, variances, setoff or recoupment rights, trespasses, damages, or judgments, whether asserted or unasserted, liquidated or unliquidated, based on any act or omission or other event occurring prior to the Effective Date, including Avoidance Actions and D&O Actions, and any claims acquired following the Petition Date, including without limitation all such Causes of Action described in the Disclosure Statement.

**2.2.13** *Claim* shall mean a claim against the Debtors or their Estates, as defined in Section 101(5) of the Bankruptcy Code.

**2.2.14** *Claims Litigation* shall mean any and all litigation or proceedings arising out of objections to Claims asserted against the Estates, or affirmative counterclaims or requests for setoff or recoupment that are raised with regard to Claims asserted against the Estates.

**2.2.15** *Class* shall mean any class into which Claims or Interests are classified pursuant to this Plan.

**2.2.16** *Committee* shall mean the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Tile Outlets Chapter 11 case.

**2.2.17** *Confirmation Date* shall mean the date on which the Confirmation Order is entered on the docket of the Court.

**2.2.18** *Confirmation Hearing* shall mean the hearing on confirmation of the Plan, held pursuant to Section 1128 of the Bankruptcy Code.

**2.2.19** *Confirmation Order* shall mean the Order entered by the Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**2.2.20** *Court* or *Bankruptcy Court* shall mean the United States Bankruptcy Court for the Northern District of Georgia or, in the event such Court ceases to exercise jurisdiction over the Bankruptcy Cases, such court or adjunct thereof that exercises jurisdiction over the Bankruptcy Cases in lieu of the United States Bankruptcy Court for the Northern District of Georgia.

**2.2.21** *Creditors' Claims Against Third Parties* shall mean any and all claims, causes of action, suits, proceedings, liabilities, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, setoff or recoupment rights, trespasses, damages, or judgments, whether asserted or unasserted, liquidated or unliquidated, that any creditor of Debtors could assert against any non-Debtor entity, including without limitation any current or former officer or director of Debtors or any law firm, accounting firm or other professional entity, that arises from or relates to that creditor's Claim against Debtors or either of them and which is based on any act or omission or other event occurring prior to the Effective Date.

**2.2.22** *D&O Actions* shall mean any proceeding and/or claim against persons who served prior to the Petition Dates as directors, officers, managers or employees of the Debtors, as well as any person or entity which allegedly conspired with, aided and abetted, or otherwise assisted such directors, officers, managers or employees engaged in certain acts and omissions as set out below. Persons who served prior to the Petition Dates as directors, officers, managers and employees of the Debtors (collectively, the "D&Os") include, without limitation, the following: Donald Aronin, Curt Rapp and Warren Lampert. Such proceedings and/or claims shall include, without limitation, (I) claims currently existing or which could be asserted based upon facts or events existing as of the Effective Date, regardless of whether they are covered by a D&O Policy, and (ii) any other claim against any person or entity alleged to have conspired with, aided and abetted, or otherwise assisted such D&Os in any way. The D&O Actions include, without limitation, wrongful acts and omissions that may have been committed by the D&Os while serving as directors, officers, managers or employees of the Debtors including, without limitation, breaches of fiduciary duty, negligence, gross negligence, recklessness, breaches of the duties of care, deepening insolvency, and other actions which may have led to the decline of the Debtors' business, lessened the value of the Debtors' assets, increased the amount of the Debtors' liabilities, or otherwise damaged the Debtors, the Debtors'

creditors, the member(s) of Tile Outlets, or the shareholders of Holdings, provided, however, it shall not include any claims against new and different directors, officers, managers or employees appointed as of or after the Effective Date.

**2.2.23** *Debtor*s shall mean Tile Outlets of America, LLC, inclusive of its wholly owned subsidiary Tile Outlets of Florida, LLC; Holdings; and the Reorganized Debtor, on a consolidated basis.

**2.2.24** *Designated Notice* means notice and an opportunity for a hearing as defined in section 102(a) of the Bankruptcy Code, with notice limited to Debtors, counsel for Debtors, the United States Trustee and other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the clerk of the Court and serve a copy of such notice on counsel to the Debtors.

**2.2.25** *Disallowed Claim* shall mean (a) a Claim, or any portion thereof, that has been disallowed by a Final Order of he Court; (b) a Claim that has been listed in the Schedules at zero or unknown amount or as contingent, disputed, or unliquidated and as to which no proof of claim has been timely filed or deemed timely filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court or other applicable law; or (c) a Claim that has not been listed in the Schedules and as to which no proof of claim has been timely filed or deemed timely filed with the Court pursuant to the Bankruptcy Code, any Final Order of the Court, or other applicable law.

**2.2.26** *Disputed Claim* shall mean a Claim as to which an objection has been or may be timely filed by a party-in-interest with standing and which objection has not been withdrawn or determined by a Final Order and which is not the subject of a compromise and settlement as described in this Plan. Disputed Claims shall also include any Claim held by a creditor against which the Debtors have asserted a claim that has the effect, under Section 502(d) of the Bankruptcy Code, of precluding a Distribution with respect to such Claim.

**2.2.27** *Distribution* shall mean a distribution or payment under the Plan to the holders of Allowed Claims.

**2.2.28** *Effective Date* shall mean the first Business Day occurring at least fifteen (15) days after the entry of the Confirmation Order, provided that the Confirmation Order has become a Final Order (as defined herein).

**2.2.29** *Estate* shall mean the substantively consolidated bankruptcy estate created by the confirmation of the Debtors' Chapter 11 Plan of Reorganization, after the Confirmation Date.

**2.2.30** *Estates* shall mean the bankruptcy estates created by the commencement of the Debtors' Chapter 11 cases, prior to the Confirmation Date.

**2.2.31** *Facilitating Lenders* mean the lenders providing all or part of the funds necessary to pay the sums due the holders of Allowed Claims under this Plan.

**2.2.32** *Final Order* shall mean an Order or Judgment, the operation or effect of which has not been stayed, reversed, modified, or amended and as to which Order or Judgment the time to appeal, petition for certiorari, or seek re-argument, review or rehearing has expired and as to which no notice of appeal, petition for certiorari, or motion for re-argument, review or rehearing was timely filed or, if timely filed, the Order or Judgment has been affirmed by the highest court to which the Order or Judgment was appealed or from which the re-argument or rehearing was sought, or certiorari has been denied, and the time to file any further appeal or to petition for certiorari or to seek further re-argument or rehearing has expired.

**2.2.33** *General Unsecured Claim* shall mean an Allowed Claim that is not an Administrative Claim, a Priority Claim, a Secured Claim, a Priority Tax Claim, or is not otherwise separately classified.

**2.2.34** *Holdings Petition Date* shall mean September 30, 2009, the date on which TOA Holdings, Inc. filed its Chapter 11 case.

**2.2.35** *Interests* shall mean the equity membership interests in Tile Outlets of America, LLC, including the former equity interests of Paul Sanders and Charissa Rapp which were evidenced by Promissory Notes as of the Tile Outlets Petition Date, and the equity shareholder interests in TOA Holdings, Inc.

**2.2.36** *Petition Dates* shall mean January 16, 2009, the date on which Tile Outlets filed its Chapter 11 case, and September 30, 2009, the date on which Holdings filed its Chapter 11 case.

**2.2.37** *Plan* shall mean this Plan of Reorganization, as it may be modified or amended from time to time pursuant to Section 1127 of the Bankruptcy Code and Article X of the Plan.

**2.2.38** *Priority Claim* shall mean an Allowed Claim entitled to priority pursuant to Sections 507(a)(2) through and including 507(a)(10) of the Bankruptcy Code.

**2.2.39** *Priority Tax Claim* shall mean an Allowed Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

**2.2.40** *Reorganized Debtor* shall mean Tile Outlets of America, LLC, and TOA Holdings, Inc., on a substantively consolidated basis, after entry of the Confirmation Order and on the Effective Date of the Plan.

**2.2.41** *Scheduled* shall mean, with respect to any Claim or Interest, the status and amount, if any, of such Claim or Interest, as set forth in the Debtors' Schedules.

**2.2.42** *Schedules* shall mean the Debtors' Schedules of Assets and Liabilities and Statement of Financial Affairs, all as amended, filed on or about January 16, 2009, and as amended from time to time in the Tile Outlets of America, LLC, case, and on September 30, 2009, in the TOA Holdings, Inc. case.

**2.2.43** *Secured Claim* shall mean an Allowed Claim secured by a lien on property of the Estate to the extent of the value, as of the Effective Date, of such lien as determined by a Final Order of the Court pursuant to Section 506 of the Bankruptcy Code, or as otherwise agreed in writing by the Debtors and the holder of such Allowed Claim.

**2.2.44** *Shares* shall mean a shareholder's equity interests in TOA Holdings, Inc.

**2.2.45** *Tile Outlets Petition Date* shall mean January 16, 2009, the date on which Tile Outlets filed its Chapter 11 case.

**2.2.46** *Unclaimed Property* means any funds payable to holders of Claims which are unclaimed.

**2.2.47** *Unsecured Claim Payment Date* shall mean the first Business Day which is thirty (30) days after the Effective Date.

## ARTICLE III.
## CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1**    Introduction

**3.1.1**  All Claims and Interests in the Bankruptcy Case are classified in the Classes below. Notwithstanding any other provision of the Plan, a Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class, and only to the extent such Claim has not been paid, released, or otherwise satisfied prior to the Effective Date.

**3.1.2**  Under the provisions of Section 1123(a)(1) of the Bankruptcy Code, Claims of a kind specified in Sections 507(a)(2) [administrative expenses, etc.], 507(a)(3) [so-called "gap" claims] and 507(a)(8) [tax claims] may not be designated by the Debtors as being in particular classes. Notwithstanding this prohibition of classification, these Claims are nevertheless treated in Article IV of this Plan.

**3.2**    **Classification.**  Claims and Interests are classified as follows:

**Class 1  - Administrative Claims.**    Class 1 will consist of all Administrative Claims.

**Class 2  - Priority Tax Claims.**    Class 2 will consist of all Priority Tax Claims, including any Tax or Customs Claims held by the United States of America; the State of Georgia; the State of Florida; Gwinnett County, Georgia; Hillsborough County, Florida; Lee County, Florida; or other appropriate taxing authorities.

**Class 3  - Priority Claims.**  Class 3 will consist of all Priority Claims.

**Class 4 - General Unsecured Claims.**    Class 4 shall consist of all Unsecured Claims, other than Claims separately classified in Class 5 of this Plan.

**Class 5 – Landlords' Claims.**  Class 5 consists of the unsecured claim of the lessors of Debtors' business premises.

**Class 6 - Secured Claim of Branch Banking & Trust Company.**  Class 6 shall consist of the Secured Claim of Branch Banking & Trust Company.

**Class 7 - Secured Claim of GE Capital.**  Class 7 shall consist of the Secured Claim of GE Capital.

**Class 8 - Secured Claim of Toyota Financial Services.**  Class 8 shall consist of the Secured Claim of Toyota Financial Services.

**Class 9  - Other Secured Claims.**  Class 9 consists of the secured claims of Avaya Financial and Court Square Leasing.

**Class 10 - Interests.**  Class 10 consists of all Interests.

## ARTICLE IV.

## TREATMENT AND IMPAIRMENT OF CLAIMS, INTERESTS AND PRIORITY CLAIMS

The treatment and impairment of each of the classes of Claims and Interests set forth in Article III and the treatment and impairment of Priority Claims, are described as follows:

**4.1    Class 1 - Administrative Claims.**

**4.1.1 Treatment.**  Except as may otherwise be agreed between the Debtors and the holder of an Administrative Claim, the Reorganized Debtor will pay all Administrative Claims that are allowed as of the Effective Date in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable. Subsequent to the Effective Date, the Reorganized Debtor will pay each Administrative Claim that becomes allowed following the Effective Date in Cash in full as soon as reasonably practicable after the date the Claim is allowed; provided, however, that the Reorganized Debtor shall be authorized to make Distributions to Allowed Claims in Classes 4 and 5, after reserving an adequate amount to pay any Claims in Classes 1, 2, and 3 that are subject to objection at the time of such Distribution.

**4.1.2  Impairment.**  Class 1 is not impaired by the Plan.

 **4.2    Class 2 - Priority Tax Claims.**

**4.2.1 Treatment.**

**4.2.1.1**  To the extent that any Priority Tax Claims have not been satisfied prior to the Effective Date, the Reorganized Debtor will pay all remaining Priority Tax Claims in Cash in full on the Effective Date or as soon thereafter as

is reasonably practicable, but in no event later than the end of five (5) years from the Tile Outlets Petition Date.

**4.2.1.2** As to any Priority Tax Claim not paid in full on the Effective Date, the holder of such Priority Tax Claim shall also be paid regular quarterly installment payments which include an amount of interest and at a rate of interest ordered by the Court (or agreed by the holder and the Reorganized Debtor) as being necessary to assure the holder of the Priority Tax Claim the full value of the Priority Tax Claim, pursuant to Section 1129(a)(9)(C) of the Bankruptcy Code, but in no event greater than 7.5% APR.

**4.2.1.3** To the extent that any Class 2 Claim is allowed after the Effective Date, it will be paid in full in Cash within thirty (30) days after the Claim is allowed or, at the sole discretion of the Reorganized Debtor as soon thereafter as is reasonably practicable over a period no later than the end of five (5) years from the Petition Date by quarterly installment payments, including interest calculated as set forth above.

**4.2.1.4** All Class 2 Claims will be paid after Distributions have been made to Class 1, Class 3 and Class 6 Claims existing on the Effective Date, but prior to payment to any Claims in Classes 4 or 5; provided, however, that the Debtor shall be authorized to make Distributions to Allowed Claims in Classes 4 and 5 after reserving an adequate amount to pay any Claims in Classes 1, 2, and 3 that are subject to objection at the time of such Distribution.

**4.2.2  Impairment.**  Class 2 is not impaired by the Plan.

**4.3    Class 3 - Priority Claims.**

**4.3.1 Treatment.**

**4.3.1.1** Debtors know of no Claims entitled to priority under Section 507 which are not Administrative Claims or Priority Tax Claims.  To the extent there are such claims and, except as may otherwise be agreed between the Reorganized Debtor and the holder of a Priority Claim, the Reorganized Debtor will pay all Priority Claims that are allowed as of the Effective Date in Cash in full on the Effective Date or as soon thereafter as is reasonably practicable.

**4.3.1.2** To the extent that any Class 3 Claim is allowed after the Effective Date, it will be paid in full in Cash within thirty (30) days after the Claim is allowed or as soon thereafter as is reasonably practicable.

**4.3.1.3** All Class 3 Claims will be paid prior to payment to any Claims in Classes 4 or 5; provided, however, that the Reorganized Debtor shall

be authorized to make Distributions to Allowed Claims in Classes 4 and 5 after reserving an adequate amount to pay any Claims in Classes 1, 2, and 3 that are subject to objection at the time of such Distribution.

**4.3.2  Impairment.**  Class 3 is not impaired by the Plan.

## 4.4    Class 4 -  General Unsecured Claims.

### 4.4.1  Treatment.

**4.4.1.1** Thirty (30) days after the Effective Date, and after the payment of Distributions (to the extent and in the manner contemplated by the Plan) to the holders of Allowed Claims in Classes 1 through 3 (and reserving of an appropriate amount for Disputed Claims in said Classes), the Reorganized Debtor shall make a one-time Distribution to holders of General Unsecured Claims equal to seven and one-half percent (7.5%) of such holder's Class 4 Claim in full and final satisfaction of such Claim.

**4.4.1.2** To the extent that any Class 4 Claim is allowed after the Effective Date, it will be paid seven and one-half percent (7.5%) of the Allowed Claim in Cash within thirty (30) days after the Claim is allowed or as soon thereafter as is reasonably practicable after the Claim is allowed.

**4.4.2  Impairment.**  Class 4 is impaired by the Plan.

## 4.5    Class 5 – Landlords' Claims.

### 4.5.1 Treatment

**4.5.1.1**  On the first day of the month following the Effective Date and on the first day of each subsequent month until the termination of each of Debtors' premises leases, respectively, Debtors shall pay the holders of Allowed Claims in Class 5 the monthly rental amounts due under each such lease, as previously amended.   For each of the first six (6) months following the Effective Date, Debtors shall also pay the holders of Allowed Claims in Class 5 one-sixth (1/6) of the accrued but unpaid rental which existed as of the Tile Outlets Petition Date pursuant to the respective premises leases.

**4.5.1.2** To the extent that any Class 5 Claim is allowed after the Effective Date, the six monthly payments of one-sixth (1/6) of the accrued but unpaid rental which existed as of the Tile Outlets Petition Date shall commence on the first day of the month following the Claim becoming an Allowed Claim.

**4.5.2   Impairment.**  Class 5 is impaired by the Plan.

**4.6  Class 6 - Secured Claim of Branch Banking & Trust Co.**

**4.6.1  Treatment.**  The Secured Claim of Branch Banking & Trust Co. shall be settled and satisfied in full as follows: on the Effective Date, the Reorganized Debtor shall pay BB&T a sum equal to BB&T's Allowed Claim, as of the Effective Date, said balance not to include any fees or amounts resulting from a default interest rate.

**4.6.2** Class 6 is not impaired by the Plan.

**4.7  Class 7 - Secured Claim of GE Capital.**

**4.7.1   Treatment.** The secured claim of GE Capital ("GE"), the Class 7 Claimant, shall be settled and satisfied in full as follows:

**4.7.1.1**  The secured claim of GE shall be allowed in the amount of $21,147.98 (the "GE Secured Claim").

**4.7.1.2** The GE Secured Claim will be settled and satisfied in full by payment of one hundred percent (100 %) of the allowed amount of such claim in monthly installments with interest accruing on the unpaid balance at the pre-Petition contract rate of nine and two tenths (9.2 %) percent per annum.  The amount of such monthly installments shall be computed by amortizing the principal and interest over a period of twelve months.

**4.7.1.3**  Monthly installment payments shall continue on the same date each month as provided in the contract between the parties, beginning after the Effective Date.

**4.7.1.4** The pre-Petition security interest held by GE in the assets of Debtors existing on the Petition Date shall continue in full force and effect until such time as the GE's Class 7 secured claim is paid in full.

**4.7.1.5** To the extent the GE Allowed Claim is in excess of the GE Secured Claim, the excess shall be treated as a Class 4 General Unsecured Claim.

**4.7.3**  Impairment. Class 7 is impaired by the Plan.

**4.8  Class 8 - Secured Claim of Toyota Financial Services.**

**4.8.1   Treatment.** The secured claim of Toyota Financial Services ("Toyota"), the Class 8 Claimant, shall be settled and satisfied in full as follows:

**4.8.1.1**  The secured claim of Toyota shall be allowed in the amount of $16,950.83 (the "Toyota Secured Claim").

**4.8.1.2** The Toyota Secured Claim will be settled and satisfied in full by payment of one hundred percent (100 %) of the allowed amount of such claim in monthly installments with interest accruing on the unpaid balance at the pre-Petition contract rate of eight and three quarters (8.75 %) percent per annum. The amount of such monthly installments shall be computed by amortizing the principal and interest over a period of twelve months.

**4.8.1.3**  Monthly installment payments shall continue on the same date each month as provided in the contract between the parties, beginning after the Effective Date.

**4.8.1.4** The pre-Petition security interest held by Toyota in the assets of Debtors existing on the Petition Date shall continue in full force and effect until such time as the Toyota's Class 8 secured claim is paid in full.

**4.8.1.5** To the extent the Toyota Allowed Claim is in excess of the Toyota Secured Claim, the excess shall be treated as a Class 4 General Unsecured Claim.

**4.8.3**  Impairment. Class 8 is impaired by the Plan.

## 4.9  Class 9 - Other Secured Claims.

### 4.9.1  Treatment.

**4.9.1.1** Commencing on the appropriate day of the month following the Effective Date, the Class 9 Claimants shall receive amounts equal to the monthly amounts due under their respective contracts with Debtors until their claims are paid in full.

**4.9.1.2** Until paid in full, Class 9 Claimants shall retain their security interests in Debtors' equipment which secures the Class 9 Claimants' respective claims.

**4.9.2** Class 9 is not impaired by the Plan.

## 4.10 Class 10 - Interests.

**4.10.1   Treatment.** As of the Effective Date, all Interests shall be deemed cancelled and rendered null and void.  Holders of Interests shall not receive or

retain any property under the Plan on account of such Interests, and no distributions or dividends will be paid with respect to the Interests.

**4.10.2** Class 10 is impaired by the Plan. Holders of Interests are not entitled to vote to accept or reject the Plan and Class 10 is deemed to have rejected the Plan.

**4.10 Provisions Related to Class 1, Class 2, and Class 3 Claims.** The Plan contains provisions that set forth the treatment of Claims of a kind specified in Sections 507(a)(2) through 507(a)(10) of the Bankruptcy Code. Such treatment is consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code, and the holders of such Claims are not entitled to vote on this Plan. Notwithstanding any other provision of this Plan, pursuant to Section 1123(a)(1) of the Bankruptcy Code, Claims under Sections 507(a)(2) through 507(a)(10) of the Bankruptcy Code are not designated as classes of Claims for purposes of this Plan and all references in this Plan to Class 1, Class 2 and/or Class 3 Claims are for organizational purposes and convenience of reference only.

## ARTICLE V.

## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**5.1   Funding of Plan.** The Distributions contemplated by this Plan shall be made through the use of earnings and revenues of the Debtors and the Reorganized Debtor during the pendency of the Cases and following the Effective Date, including without limitation the cash collateral, which is subject to Branch Banking & Trust Co.'s Secured Claim until such claim is paid in full pursuant to this Plan. In addition, Debtor has arranged to borrow such sums as are necessary from the Facilitator Lenders to implement this Plan. The Facilitator Lenders will loan the Reorganized Debtor $550,000.00, in exchange for a first priority security interest and a second priority security interest, respectively, encumbering all assets of the Reorganized Debtor, except those subject to purchase money security interests. Further, the Distributions will be funded by the purchase of new membership interests in the Reorganized Debtor by Donald Aronin, Warren Lampert, Lori E. Kirschner and Helaine O. Lasky for the total sum of $495,000.00 on the Effective Date. Additional loans to the Reorganized Debtor may be made by Erica Aronin, if needed for the Reorganized Debtor's operations.

**5.2 Extinguishment of Certain Causes of Action.** On the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, except as otherwise provided in the Plan, all Avoidance Actions and D&O Actions that the Debtors or the Estates had or had power to assert immediately prior to the Confirmation Date shall be extinguished.

**5.3  Settlement of Claims.**  Debtors shall be authorized to resolve objections to Claims without notice or further order of the Court.

**5.4  Exclusive Right to Modify Plan.**  Debtors shall retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to, or modifications of, the Plan until and including the Confirmation Date.

**5.6    Effectuating Documents; Further Transactions.**    Debtors shall be authorized to execute, deliver, file, and/or record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF THE PLAN

**6.1  Classes Entitled to Vote.**  Each impaired Class (other than Class 10) shall be entitled to vote to accept or reject the Plan.  Class 10 is deemed to have rejected the Plan and is not entitled to vote on the Plan.  Each unimpaired Class of Claims shall be deemed to have accepted the Plan, and shall not be entitled to vote to accept or reject the Plan.

**6.2    Claim Designation.**    The Plan Proponent reserves the right to seek to designate, pursuant to Section 1126(e) of the Bankruptcy Code, any Claimholder whose vote on the Plan was submitted for an improper purpose or was otherwise not submitted in good faith.

## ARTICLE VII.

## PROVISIONS REGARDING DISTRIBUTIONS

**7.1    Date of Distributions to Creditors.**    Payments to holders of Allowed Claims shall be paid as provided for in Article IV of this Plan.

**7.2    Interest on Claims.**  Except as provided in a Final Order entered in the Bankruptcy Case, (a) no holder of any Claim, other than the holders of a Claim in Classes 6, 7, 8 or 9, shall be entitled to interest accruing on or after the Petition Date on such Claim, and (b) interest shall not accrue or be paid upon any Disputed Claim with respect to the period from the Petition Date to the date a Distribution is made thereon if and after such Disputed Claim, or any part thereof, becomes an Allowed Claim.

**7.3   Method of Payment.**   The Reorganized Debtor shall be the Disbursing Agent under the Plan.  All payments made pursuant to this Plan shall be in Cash or by any means reasonably selected by the Reorganized Debtor, including check or wire transfer.

**7.4  Unclaimed Property.**

**7.4.1**   Unclaimed Property shall include (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (b) funds for checks which have not been presented and paid within ninety (90) days of their issuance, (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property and (d) checks (and the funds represented thereby) which are not mailed due to the lack of required tax identification information, but only following two mailed requests for this tax identification information.

**7.4.2**  For a period of the later of one year following the first Distribution to a Class of Claims or 180 days after a Distribution is made to a claimant on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property shall be held solely for the benefit of the holders of Allowed Claims which have failed to claim such property. During the Claiming Period, Unclaimed Property due the holder of an Allowed Claim shall be released and delivered to such holder upon presentation of proper proof by such holder of its entitlement thereto.

**7.4.1**   In the event that there is Unclaimed Property with regard to any Claim, Debtor shall, until such Unclaimed Property is claimed or the Claiming Period with regard to the holder of such Claim has expired, retain all subsequent Distributions due with regard to such Claim.

**7.4.2**  After the Claiming Period with regard to such holder has expired, no subsequent Distributions shall be made on account of such Claim, and such Claim shall be treated as being disallowed, waived, and satisfied; provided, however, that the Claiming Period may be extended for the holder of any Allowed Claim by agreement between the Claimant and Debtor.  At the end of the Claiming Period, the holder of an Allowed Claim theretofore entitled to Unclaimed Property shall cease to be entitled thereto and the Unclaimed Property shall become the property of the Reorganized Debtor.

**7.4.3**  All parties entitled to participate in Distributions under this Plan shall be required to notify the Debtor in writing of any change in the address to which Distributions are to be sent.

**7.4.4**  These provisions shall apply without regard to any applicable non-bankruptcy laws with respect to unclaimed property.

**7.5  Rounding.**  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment made by the Reorganized Debtor may reflect a rounding of such fraction down to the nearest whole cent.

**7.6  DeMinimus Payments.**  Debtors shall not issue payments pursuant to this Plan on account of any Claim for which the Distribution would equal $15.00 or less.

**ARTICLE VIII.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**8.1  Assumption.**  Executory contracts and unexpired leases that have not been previously assumed or rejected shall be deemed assumed as of the Effective Date.

**8.2  Cure of Defaults.**  All cure payments which may be required by Section 365(b)(1) of the Code under any executory contract or unexpired lease shall be made by the Reorganized Debtor on the Effective Date or as soon as practicable thereafter except as otherwise provided in Section 4.5 hereof.  In the event of a dispute regarding the amount of any cure payment, the ability of the Reorganized Debtor to provide adequate assurance of future performance or any other matter pertaining to assumption or assignment, the Reorganized Debtor shall make such cure payments required by Section 365(b)(1) of the Code following the entry of a Final Order resolving such dispute.  The Reorganized Debtor shall cure all other non-bankruptcy defaults existing under any executory contract or unexpired lease assumed.

**8.3  Claims for Damages.**  Each person who is a party to an executory contract or unexpired lease, previously rejected by Debtors during the pendency of the Cases shall be entitled to file, not later than thirty (30) days after Court approval of such rejection, a proof of claim for damages alleged to arise from the rejection of such executory contract or unexpired lease to which such Person is a party. Payment of such Claim (consistent with the payments received by holders of other Claims in the Class into which such Claim falls, as determined by Section 8.4 hereof) shall be made on the later of (I) the tenth (10th) day after the expiration of the time for filing an objection in respect of any proof of claim provided it is a Business Day, or the first Business Day thereafter if the tenth day is not a Business Day and (ii) the tenth (10th) day after the Claim has been allowed by a Final Order provided it is a Business Day, or the first Business Day thereafter if the tenth day is not a Business Day, provided that no such payments shall be made before the Effective Date.

**8.4   Classification of Claims.**    Allowed Claims arising out the rejection of executory contracts or unexpired leases shall be Class 4 Claims.

**ARTICLE IX.**

**<u>RETENTION OF JURISDICTION</u>**

Until the Cases are closed, the Court shall retain jurisdiction over all matters arising out of or relating to the Cases, including, but not limited to, the following matters:

**9.1**  To determine the allowance or classification of Claims or Interests under this Plan and to determine any objections thereto;

**9.2**  To construe and to take any action to enforce this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan;

**9.3**  To determine all applications for allowance of compensation or reimbursement of expenses;

**9.4**  To determine any other request for payment of Administrative Expenses;

**9.5**  To resolve any dispute regarding the implementation or interpretation of this Plan;

**9.6**  To determine any and all motions pending on Confirmation for the rejection, assumption or assignment of executory contracts or unexpired leases and the allowance of any Claim resulting therefrom;

**9.7**  To determine all applications, motions, adversary proceedings, contested matters and other litigated matters that may be pending in this Court on or initiated after the Effective Date;

**9.8**  To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

**9.9**  To modify the Plan pursuant to Section 1127 of the Code, or to remedy any apparent nonmaterial defect or omission in this Plan, or to reconcile any nonmaterial inconsistency in this Plan so as to carry out its intent and purpose;

**9.10**  To enter an order or final decree closing the Cases;

**9.11**  To determine matters under Section 505 of the Code relating to any tax for which the Reorganized Debtor may be liable;

**9.12**   To consider and act on the compromise and settlement of any claim against the Debtors or Debtors-in-Possession or their Estates;

**9.13**  To determine all questions and disputes regarding title to the assets of the Debtors, Debtors-in-Possession, the Estates or the Reorganized Debtor; and

**9.14**   To construe, enforce and resolve all questions and disputes relating to employment agreements existing or approved by the Court at or prior to Confirmation.

## ARTICLE X

## EFFECTIVE DATE OF THE PLAN

**10.1  Effective Date.**  This Plan shall take effect on the Effective Date.

## ARTICLE XI

## CRAM-DOWN

Debtors hereby requests confirmation pursuant to the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code with respect to any impaired Class that votes to reject the Plan.

## ARTICLE XII.

## SUBSTANTIVE CONSOLIDATION

Debtors hereby request that the Confirmation Order provide for the substantive consolidation of Tile Outlets of America, LLC, and TOA Holdings, Inc. into one entity, the Reorganized Debtor, under 11 U.S.C. § 105 and Federal Rule of Bankruptcy Procedure 1015.

## ARTICLE XIII.

## MISCELLANEOUS

**13.1  Headings.**  The headings of the articles, sections and subsections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

508900v4

**13.2  Binding Effect.**  The Plan shall be legally binding upon and inure to the benefit of the Debtors, the Estates, the holders of Claims, the holders of Interests, the holders of Shares, and their respective successors and assigns.

**13.3  Notices.**  Any notice required or permitted to be provided to the Debtors under the Plan shall be in writing and served by overnight courier service or by certified mail, return receipt requested, addressed as follows:

**To Debtors:**
Tile Outlets of America, LLC
TOA Holdings, Inc.
c/o Don Aronin
3845 Holcomb Bridge Road
Suite 100
Norcross, Georgia  30092
*with a copy to:*

Karen Fagin White, Esquire
**Cohen Pollock Merlin & Small, P.C.**
3350 Riverwood Parkway
Suite 1600
Atlanta, GA 30339

**13.4  Prepayment.**   Unless the Plan or the Confirmation Order otherwise provides, the Reorganized Debtor shall have the authority to prepay, without penalty, all or any portion of an Allowed Claim at any time.

**13.5  Amendment to the Debtors' Organizational Documents.**  As of the Effective Date, the Debtors' organizational documents shall be deemed amended to include a provision that prohibits the issuance of nonvoting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

**13.6  Identity of Principals of the Reorganized Debtor.**  Don Aronin and Warren Lampert will serve as officers of the Reorganized Debtor.  Don Aronin will be the President and chief operating officer of the Reorganized Debtor. Warren Lampert will serve as Executive Vice President and Chief Financial Officer of the Reorganized Debtor.

**13.7  Amendments and Modifications.**  This Plan may be altered, amended or modified by Debtors at any time, subject, however, to Section 1127 of the Code. This Plan may not be altered, amended or modified without the written consent of Debtors.  Debtors may withdraw this Plan at any time.

**13.8   Retention of Property of the Estate.**  Except to the extent the same is disposed of in accordance with the provisions of this Plan, the Reorganized Debtor shall retain all of the property of the Estates within the meaning of Section 541 of the Code.

**13.9   Discharge.**  The Reorganized Debtor shall receive a discharge of any indebtedness owed to any creditors for which payment is not provided in this Plan and to the full extent authorized in Section 1141(d) of the Code.

**13.10   Severability.**  If any section[s] or provision[s] of this Plan is found to be contrary to law or unenforceable, then at the option of the Debtors, such section[s] or provision[s] shall be deemed no longer a part of this Plan.

**13.11   Continuation of all Retiree Benefits.**  To the extent applicable to the Reorganized Debtor, all retiree benefits, as that term is defined in Section 1114 of the Code, shall be continued in accordance with Section 1129(a)(13) of the Code.

**13.12   Objections to Claims and Interests.**  All objections to any claim or interest shall be filed by the Debtors or other party in interest no later than sixty (60) days after the Effective Date.

**13.13   Applications for Compensation of Professional Persons.**  Except with respect to requests for compensation for services performed on and after Confirmation, each Person retained or requesting compensation in the Cases, pursuant to Section 327, 328, 330, 331, 503(b) or 1113 of the Code, shall be entitled to file an application for allowance of final compensation and reimbursement of expenses in the Cases until not later than thirty (30) days after the Effective Date.  Objections to each such application may be filed on or before the twentieth day thereafter.

**13.14   Payment of Compensation to Professional Persons for Services Rendered after Confirmation.**  Compensation and reimbursement of expenses earned and incurred by professionals performing services for the Reorganized Debtor after Confirmation shall be paid by the Reorganized Debtor monthly after rendition of bills to the Reorganized Debtor, and no further applications for compensation or reimbursements of expenses shall be necessary or required unless a dispute arises in regard thereto; in the event of any such dispute, the same shall be resolved by the Court after notice and hearing.

**13.15   U.S. Trustee Fees.**  The Debtors and the Reorganized Debtor, as appropriate, shall cause to be paid any and all fees of the Office of the United States Trustee as and when such fees become due.

Respectfully submitted this 16th day of October, 2009.

**COHEN POLLOCK
MERLIN & SMALL, P.C.**
Counsel for Debtors

_____/s/ Don Aronin_____

Don Aronin
President and Chief Operating
Officer, Tile Outlets of America LLC

_____/s/ Don Aronin_____

Don Aronin
Secretary, TOA Holdings, Inc.

_____/s/ Karen Fagin White_____

Gus H. Small
GA Bar No.: 653200
Karen Fagin White
GA Bar No.: 754450
Anna M. Humnicky
GA Bar No.: 377850
3350 Riverwood Parkway
Suite 1600
Atlanta, GA 30339
(770) 858-1288
Fax: (770) 858-1277
gsmall@cpmas.com
kfwhite@cpmas.com
ahumnicky@cpmas

EXHIBIT "B"

LIQUIDATION ANALYSIS

**Summary Analysis of Proceeds Available for Unsecured Claims**

|  | GOB Sale High | GOB Sale Low | Business Liquidation High | Business Liquidation Low |
|---|---|---|---|---|
| Total Proceeds | $1,989,755 | $1,297,750 | $904,755 | $519,000 |
| Total Costs of Liquidation | $1,006,547 | $884,378 | $466,428 | $245,993 |
| **Net Proceeds for Distribution** | **$983,209** | **$413,373** | **$438,328** | **$273,007** |
| Total Secured Claims | $900,639 | $413,373 | $438,328 | $273,007 |
| Total Administrative/Priority Claims | $64,907 | $0 | $0 | $0 |
| **Total Available for Unsecured Claims** | **$17,663** | **$0** | **$0** | **$0** |
| Chapter 11 Administrative/Priority Claims Shortfall | $0 | $64,907 | $64,907 | $64,907 |
| General Unsecured Claims | $2,700,000 | $2,700,000 | $2,700,000 | $2,700,000 |
| Secured Claims Shortfall | $0 | $487,267 | $462,311 | $627,632 |
| Real Estate Lease Claims | $710,312 | $710,312 | $710,312 | $710,312 |
| **Total Unsecured Claims** | **$3,410,312** | **$3,962,486** | **$3,937,530** | **$4,102,851** |
| **Unsecured Claims Percentage Recovery** | **0.52%** | **0.00%** | **0.00%** | **0.00%** |

**Tile Outlets of America, LLC and Subsidiary Liquidation Analysis**

**As Of September 30, 2009**

| Notes | | Book Value | Going Out of Business Sale Scenario | | | | Business Liquidation Scenario | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Low Recovery | Low % | High Recovery | High % | Low Recovery | Low % | High Recovery | High % |
| | **Gross Proceeds Available for Distribution** | | | | | | | | | |
| 1 | Cash | $100,000 | $100,000 | 100.00% | $100,000 | 100.00% | $100,000 | 100.00% | $100,000 | 100.00% |
| 2 | Credit Card Receivables | $60,000 | $51,000 | 85.00% | $58,200 | 97.00% | $51,000 | 85.00% | $58,200 | 97.00% |
| 3 | Prepaid Expenses | $100,000 | $0 | 0.00% | $6,750 | 6.75% | $0 | 0.00% | $6,750 | 6.75% |
| 4 | Inventory | $1,750,000 | $1,093,750 | 62.50% | $1,610,000 | 92.00% | $315,000 | 18.00% | $525,000 | 30.00% |
| 5 | Fixed Assets-Purchase Money Security Interests | $115,000 | $34,500 | 30.00% | $99,199 | 86.26% | $34,500 | 30.00% | $99,199 | 86.26% |
| 5 | Fixed Assets-Other | $185,000 | $18,500 | 10.00% | $37,000 | 20.00% | $18,500 | 10.00% | $37,000 | 20.00% |
| 6 | Other Assets | $80,622 | $0 | 0.00% | $78,606 | 97.50% | $0 | 0.00% | $78,606 | 97.50% |
| | **Total Proceeds** | **$2,390,622** | **$1,297,750** | **54.29%** | **$1,989,755** | **83.23%** | **$519,000** | **21.71%** | **$904,755** | **37.85%** |
| | | | | | | | | | | |
| | **Costs Associated with Liquidation** | | | | | | | | | |
| 7 | Chapter 7 Trustee Fees | | $57,653 | 4.44% | $78,197 | 3.93% | $21,650 | 4.17% | $40,578 | 4.48% |
| 8 | Professional fees | | $50,000 | 3.85% | $100,000 | 5.03% | $50,000 | 9.63% | $100,000 | 11.05% |
| 9 | Wind-Down Costs | | $776,725 | 59.85% | $828,350 | 41.63% | $174,343 | 33.59% | $325,850 | 36.02% |
| | **Total Costs** | | **$884,378** | **68.15%** | **$1,006,547** | **50.59%** | **$245,993** | **47.40%** | **$466,428** | **51.55%** |
| | | | | | | | | | | |
| | **Net Proceeds Available for Distribution** | | **$413,373** | **31.85%** | **$983,209** | **49.41%** | **$273,007** | **52.60%** | **$438,328** | **48.45%** |
| | | Allowable Claim | Low Recovery | Low Recovery % | High Recovery | High Recovery % | Low Recovery | Low Recovery % | High Recovery | High Recovery % |
| | **Pre-Petition Secured Claims** | | | | | | | | | |
| | Avaya Financial Services | $1,200 | $700 | 58.33% | $1,200 | 100.00% | $700 | 58.33% | $1,200 | 100.00% |
| | Branch Banking & Trust | $801,439 | $378,873 | 47.27% | $801,439 | 100.00% | $238,507 | 29.76% | $339,128 | 42.31% |
| | Court Square Leasing | $4,000 | $1,200 | 30.00% | $4,000 | 100.00% | $1,200 | 30.00% | $4,000 | 100.00% |
| | GE Capital | $48,000 | $14,400 | 30.00% | $48,000 | 100.00% | $14,400 | 30.00% | $48,000 | 100.00% |
| | Toyota Financial Services | $35,000 | $10,500 | 30.00% | $35,000 | 100.00% | $10,500 | 30.00% | $35,000 | 100.00% |
| | Orion | $11,000 | $7,700 | 70.00% | $11,000 | 100.00% | $7,700 | 70.00% | $11,000 | 100.00% |
| 10 | **Total Secured Claims** | **$900,639** | **$413,373** | **45.90%** | **$900,639** | **100.00%** | **$273,007** | **30.31%** | **$438,328** | **48.67%** |
| | | | | | | | | | | |
| | **Chapter 11 Administrative/Priority Claims** | | | | | | | | | |
| | Administrative Claims | $0 | $0 | 100.00% | $0 | 100.00% | $0 | 100.00% | $0 | 100.00% |
| | Priority Tax Claims | $4,907 | $0 | 100.00% | $4,907 | 100.00% | $0 | 100.00% | $0 | 100.00% |
| | Other Priority Claims | $0 | $0 | 100.00% | $0 | 100.00% | $0 | 100.00% | $0 | 100.00% |
| | Post-Petition Trade and Other | $60,000 | $0 | 0.00% | $60,000 | 100.00% | $0 | 0.00% | $0 | 0.00% |
| 11 | **Total Chapter 11 Administrative/Priority Claims** | **$64,907** | **$0** | **0.00%** | **$64,907** | **100.00%** | **$0** | **0.00%** | **$0** | **0.00%** |
| | | | | | | | | | | |
| | **Net Proceeds Available for Unsecured Claims** | | **$0** | | **$17,663** | | **$0** | | **$0** | |
| | | | | | | | | | | |
| | **Unsecured Claims** | | | | | | | | | |
| | General Unsecured Claims | $2,700,000 | | | | | | | | |
| | Secured Claims Shortfall | | $487,267 | | $0 | | $627,632 | | $462,311 | |
| | Administrative/Priority Claims Shortfall | | $64,907 | | $0 | | $64,907 | | $64,907 | |
| | Real Estate Leases | $710,312 | | | | | | | | |
| 12 | **Total Unsecured Claims - Low GOB** | **$3,962,486** | | | | | | | | |
| 12 | **Total Unsecured Claims - High GOB** | **$3,410,312** | | | | | | | | |
| 12 | **Total Unsecured Claims -Low Liquidation** | **$4,102,851** | | | | | | | | |
| 12 | **Total Unsecured Claims -High Liquidation** | **$3,937,530** | | | | | | | | |

**Liquidation Expenses - Going Out of Business Sale**

### Month 1

| Expense Item | SSC | FM | Tpa | Total |
|---|---|---|---|---|
| Personnel | $18,000 | $50,000 | $50,000 | |
| Advertising | $0 | $40,000 | $50,000 | |
| Occupancy | $4,500 | $44,000 | $38,000 | |
| Equipment | $1,000 | $2,500 | $2,500 | |
| Shipping/Supplies | $250 | $1,800 | $2,000 | |
| Services | $5,000 | $12,000 | $12,000 | |
| Other | $0 | $1,000 | $1,000 | |
| **Total Expenses - Mo 1** | **$28,750** | **$151,300** | **$155,500** | **$335,550** |

### Month 2

| Expense Item | SSC | FM | Tpa | |
|---|---|---|---|---|
| Personnel | $0 | $40,000 | $30,000 | |
| Advertising | $0 | $40,000 | $25,000 | |
| Occupancy | $0 | $44,000 | $38,000 | |
| Equipment | $0 | $2,500 | $2,500 | |
| Shipping/Supplies | $0 | $1,800 | $15,000 | |
| Services | $0 | $12,000 | $6,000 | |
| Other | $0 | $1,000 | $5,000 | |
| **Total Expenses - Mo 2** | **$0** | **$141,300** | **$121,500** | **$262,800** |

### Month 3

| Expense Item | SSC | FM | Tpa | |
|---|---|---|---|---|
| Personnel | $0 | $15,000 | $0 | |
| Advertising | $0 | $0 | $0 | |
| Occupancy | $0 | $44,000 | $0 | |
| Equipment | $0 | $2,000 | $0 | |
| Shipping/Supplies | $0 | $1,800 | $0 | |
| Services | $0 | $1,200 | $0 | |
| Other | $0 | $5,000 | $0 | |
| **Total Expenses - Mo 3** | **$0** | **$69,000** | **$0** | **$69,000** |

| | High | Low |
|---|---|---|
| **Liquidator's Expense** | $161,000 | $109,375 |
| **Total Expenses** | $828,350 | $776,725 |

**Liquidation Expenses - Going Out of Business Sale**

### Month 1

| Expense Item | SSC | FM | Tpa | Total |
|---|---|---|---|---|
| Personnel | $13,000 | $15,000 | $15,000 | |
| Advertising | $0 | $0 | $0 | |
| Occupancy | $4,500 | $44,000 | $38,000 | |
| Equipment | $1,000 | $2,500 | $2,500 | |
| Shipping/Supplies | $250 | $1,800 | $2,000 | |
| Services | $5,000 | $1,000 | $1,000 | |
| Other | $0 | $1,000 | $1,000 | |
| **Total Expenses - Mo 1** | **$23,750** | **$65,300** | **$59,500** | **$148,550** |

### Month 2

| Expense Item | SSC | FM | Tpa | |
|---|---|---|---|---|
| Personnel | $0 | $15,000 | $15,000 | |
| Advertising | $0 | $0 | $0 | |
| Occupancy | $0 | $44,000 | $38,000 | |
| Equipment | $0 | $2,500 | $2,500 | |
| Shipping/Supplies | $0 | $1,800 | $2,000 | |
| Services | $0 | $1,000 | $1,000 | |
| Other | $0 | $1,000 | $1,000 | |
| **Total Expenses - Mo 2** | **$0** | **$65,300** | **$59,500** | **$124,800** |

| | High | Low |
|---|---|---|
| **Liquidator's Expense** | **$52,500** | **$25,793** |
| **Total Expenses** | **$325,850** | **$174,343** |

**Real Estate Lease Summary**

| Lease | Termination Date | Annual Base Rent | Annual Passthroughs | Total |
|-------|-----------------|-----------------|--------------------|-------|
| Fort Myers | January 31, 2016 | $318,000 | $54,000 | $372,000 |
| Tampa | August 31, 2013 | $179,760 | $128,400 | $308,160 |
| Norcross | June 30, 2011 | $30,152 | $0 | $30,152 |
| Total | | $527,912 | $182,400 | $710,312 |

**Assumptions and Notes to Liquidation Analysis**
**TOA Holdings, Inc., Tile Outlets of America, LLC and Subsidiary**

**Gross Proceeds Available for Distribution**

1. **Cash.** This includes cash on hand and in banks. The estimated recovery for this asset is 100%.

2. **Credit Card Receivables.** This includes amounts due and owing from VISA, MasterCard, Discover and American Express. The estimated recovery for this asset ranges from 85% to 97% depending upon chargeback activity.

3. **Prepaid Expenses.** This represents amounts prepaid for insurance (key man life, liability, property, and worker's compensation), service contracts (security monitoring, HVAC maintenance, and software maintenance), advertising (Yellow Pages), legal services and miscellaneous other items. The estimated recovery amount assumes contract cancellation is effective as of October 1, 2009, and that 100% of pre-payments attributable to the remaining contract term are recovered.

4. **Inventory.** Inventory is comprised of stock on hand at store locations and product in transit for which payment to the supplier has been made. The analysis includes both a "going out of business" sale scenario as well as an immediate cessation of business and a wholesale liquidation of assets.

   The "going out of business sale" analysis assumes an orderly liquidation of inventory over a 60 day period followed by a wholesale liquidation of any remaining inventory over an additional 30 day period. The estimated high recovery assumes an orderly liquidation of 90% of inventory via the "going out of business sale" at an average of 100% of book value followed by a wholesale liquidation of 10% of inventory over an additional 30 day period at an average of 20% of book value. The estimated low recovery assumes an orderly liquidation of 75% of inventory via the "going out of business sale" at an average of 80% of book value followed by a wholesale liquidation of 25% of inventory over an additional 30 day period at an average of 10% of book value. It is also assumed that all inventory remaining at the Tampa store location is transferred to the Fort Myers store location after 45 days and that all wind down activity at the Tampa location is completed within 60 days.

The "business liquidation" analysis assumes an immediate cessation of business and a wholesale liquidation of inventory and a complete wind down of activities over a 60 day period. The estimated high recovery assumes an average of 30% of book value is realized while the low recovery assumes an average of 18% of book value is realized.

5.  **Fixed Assets.** Fixed assets, net of depreciation, are comprised of computer equipment, furniture and fixtures, leasehold improvements, office equipment, software, and warehouse equipment located at the store locations and corporate headquarters. The estimated recovery rates reflect the fact that certain of the fixed assets are subject to capital leases secured by the fixed asset, the effects of being in chapter 7, and the current resale market for used assets of the type included among the fixed assets.

6.  **Other Assets.** Other assets include lease deposits, utility deposits, organizational costs, trademark costs, and miscellaneous other assets of no value. The estimated recovery rates of the lease and utility deposits are 100% net of offset applied by the holder of such deposits. The organizational and trademark costs have no value.

## Costs Associated with Liquidation

7.  **Trustee Fees.** Trustee fees are estimated in accordance with section 326 of the Bankruptcy Code at 25% of the first $5,000 of liquidation proceeds, 10% of proceeds greater than $5,000 but less than $50,000, 5% of proceeds greater than $50,000 but less than $1 million, and 3% of proceeds greater than $1 million. Cash and credit card receivables are excluded from liquidation proceeds for purposes of this calculation.

8.  **Professional Fees.** It is assumed that the trustee will retain the services of a law firm, accounting firm, and asset liquidation firm to assist in the liquidation of assets and wind-down of the Debtors' estate and that each of these professionals will need to familiarize themselves with the debtor and its business and assets.

9.  **Wind-Down Expenses.** This includes estimated expenses that would be incurred to liquidate assets and wind-down the Debtors' estate. Such expenses include employee wages and benefits, general overhead costs, and advertising expense. It is also assumed that the services of a liquidation specialist are

retained and that compensation is equal to 10% of the proceeds realized from
the sale of inventory and fixed assets.

## Claims

10. **Secured Claims.** It is assumed that all secured debt, including accrued and
unpaid interest, owed by Debtor to BB&T is paid in full to the extent of available
proceeds. All other secured claims are assumed to be paid to the extent of the
liquidation value of the underlying collateral. Any claim that is not satisfied by the
value of the underlying collateral is included in the estimated amount for
unsecured claims.

11. **Chapter 11 Administrative and Priority Claims.** This includes all chapter 11
administrative claims, tax and priority claims that are senior to general unsecured
claims, post-petition trade and other claims, and any incremental administrative
claims resulting from the termination of Debtors' business.

12. **General Unsecured Claims.** This includes pre-petition contract rejection claims,
pre-petition trade payables as well as estimates for incremental contract and
lease rejection claims that would result from liquidation of Debtors' business. If
Debtors' chapter 11 cases are converted to chapter 7 proceedings, the amount of
unsecured claims would materially increase as a result of the rejection of the Fort
Myers and Tampa store leases as well as the corporate home office lease in
Norcross, Georgia. These claims would enjoy equal priority with Debtors' current
unsecured claims and would ultimately reduce the proceeds available for
distribution to Debtors' current unsecured creditors.

# EXHIBIT "C"

# PROJECTED REVENUES AND EXPENSES

Tile Outlets of America
Projected Monthly Income Statements
Consolidated

| | Jan-10 Projected | Feb-10 Projected | Mar-10 Projected | Apr-10 Projected | May-10 Projected | Jun-10 Projected | Jul-10 Projected | Aug-10 Projected | Sep-10 Projected | Oct-10 Projected | Nov-10 Projected | Dec-10 Projected | Annual Actual + Proj. 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales | $762,448 | $780,384 | $981,374 | $753,148 | $662,800 | $962,833 | $645,824 | $637,148 | $906,398 | $792,795 | $792,795 | $792,795 | $9,470,740 |
| Cost of Sales | 438,394 | 448,574 | 563,216 | 433,258 | 382,265 | 552,744 | 372,728 | 367,818 | 520,959 | 455,647 | 455,647 | 456,755 | 5,448,007 |
| Gross Profit | 324,053 | 331,810 | 418,157 | 319,890 | 280,535 | 410,089 | 273,096 | 269,330 | 385,439 | 337,147 | 337,147 | 336,040 | 4,022,733 |
| Personnel Expense | 167,401 | 167,703 | 205,239 | 166,355 | 163,195 | 204,764 | 155,497 | 154,526 | 192,040 | 158,449 | 158,233 | 188,120 | 2,081,523 |
| Advertising | 28,885 | 29,915 | 38,053 | 29,252 | 25,866 | 37,308 | 25,510 | 25,098 | 35,620 | 30,817 | 30,817 | 30,817 | 367,958 |
| Occupancy Expense | 87,856 | 87,535 | 90,877 | 88,805 | 89,440 | 93,948 | 91,883 | 91,288 | 92,800 | 89,373 | 89,108 | 90,976 | 1,083,888 |
| Equipment Expense | 4,174 | 4,174 | 5,384 | 4,174 | 4,174 | 5,384 | 4,184 | 4,184 | 5,394 | 4,184 | 4,184 | 5,394 | 54,988 |
| Supplies & Postage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Administrative Expenses | 27,833 | 28,207 | 35,509 | 27,630 | 25,727 | 33,754 | 25,475 | 25,293 | 32,697 | 28,573 | 28,573 | 30,310 | 349,581 |
| Interest Expense(net) | 5,530 | 5,468 | 5,406 | 5,343 | 5,280 | 5,216 | 5,151 | 5,088 | 5,024 | 4,962 | 4,901 | 4,838 | 62,206 |
| (Gain)/Loss on Sale of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Taxes | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 96,000 |
| Depreciation | 6,183 | 6,183 | 6,225 | 6,220 | 6,189 | 6,192 | 6,192 | 6,192 | 6,234 | 6,131 | 6,101 | 6,113 | 74,154 |
| Total SG & A | 335,862 | 337,185 | 394,692 | 335,779 | 327,870 | 394,567 | 321,892 | 319,669 | 377,809 | 330,489 | 329,917 | 364,567 | 4,170,298 |
| Net Income (Loss) from Operations | (11,809) | (5,375) | 23,465 | (15,889) | (47,335) | 15,522 | (48,796) | (50,339) | 7,630 | 6,659 | 7,230 | (28,528) | (147,565) |
| SSC Overhead Allocation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SL Rent Reserve Adjustment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Restructuring Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net Income (Loss) | (11,809) | (5,375) | 23,465 | (15,889) | (47,335) | 15,522 | (48,796) | (50,339) | 7,630 | 6,659 | 7,230 | (28,528) | (147,565) |

Tile Outlets of America
Projected Annual Income Statements

|  | Projected FY2010 |
|---|---|
| Sales | $    9,470,740 |
| Cost of Sales | 5,448,007 |
| Gross Profit | 4,022,733 |
|  |  |
| Personnel Expense | 2,081,523 |
| Advertising | 367,958 |
| Occupancy Expense | 1,083,888 |
| Equipment Expense | 54,988 |
| Administrative Expenses | 349,581 |
| Interest Expense(net) | 62,206 |
| (Gain/)Loss on Sale of Assets | - |
| Taxes | 96,000 |
| Depreciation | 74,154 |
|  |  |
| Total SG & A | 4,170,298 |
|  |  |
| Net Income (Loss) from Operations | (147,565) |